UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DEBORAH MCKEE SLIGH,

                       Plaintiff,                    **MEMORANDUM & ORDER**

    -against-                            09 CV 3507  (DRH)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                       Defendant.
--------------------------------------------------------X
**APPEARANCES**:

**For Plaintiff**:
Kassoff, Robert & Lerner, LLP
100 Merrick Road, Suite 508W
Rockville Centre, New York 11570
By:    Steven P. Lerner, Esq.

**For Defendant**:
Loretta E. Lynch
United States Attorney for the Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
By:    Candace Scott Appleton, Assistant U.S. Attorney (Of Counsel)

**HURLEY, Senior District Judge:**

       Plaintiff Deborah McKee Sligh commenced this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "defendant"), which denied her claim for disability benefits.  Presently

before the Court is defendant's motion for judgment on the pleadings.  For the reasons set forth

below, defendant's motion is granted and the decision of the Commissioner is affirmed.

## BACKGROUND

### I.      *Procedural Background*

Plaintiff applied for Social Security disability insurance benefits and Supplemental

Security Income ("SSI") on June 14, 2007.  (Transcript (hereafter "Tr.") 43.)[1]  Plaintiff alleged

that she suffered from a disability, commencing on January 23, 2007, due to a left knee injury

and a bone spur in her right heel.  (Tr. 101.)  The claim was denied initially on July 31, 2007 (Tr.

86-91), and plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing

was held before ALJ Jay L. Cohen on November 6, 2008, at which plaintiff appeared represented

by counsel.  (Tr. 9-39.)  The ALJ issued a decision on November 18, 2008 finding that plaintiff

was not disabled within the meaning of the Social Security Act.  (Tr. 40-48.)  Plaintiff requested

review by the Appeals Council ("AC").  (Tr. 219, 221-22.)   By notice dated June 2, 2009, the

AC denied plaintiff's request for review.  (Tr. 3-5.)  Subsequently, plaintiff submitted additional

evidence to the AC and on July 23, 2009, the AC set aside its June 2, 2009 decision in order to

consider that additional evidence.  (Tr. 223-26.)  After doing so, however, the AC issued a

separate decision that again denied plaintiff's request for review.  (Tr. 223-26.)  Accordingly, the

ALJ's decision became the "final decision" of the Commissioner.  (Tr. 1-3.)

### II.     *Factual Background*

#### A.      *Non-Medical Evidence*

##### 1.      <u>Hearing Testimony</u>

Plaintiff was born on July 23, 1957 and was 51 years of age at the time of the hearing.

---

[1]  Page citations are to the transcript of the administrative record filed by the
Commissioner in this case.

(Tr. 97.) She has completed high school as well as secretarial school. (Tr. 106.) From 1994 to 2005, plaintiff worked as a electronics assembler and electronics inspector, which involved assembling cell phone and television components or inspecting those components with a microscope. (Tr. 16-17, 102.) These jobs required plaintiff to walk for one hour, stand for one hour, sit for six hours, and lift less than ten pounds. (Tr. 102-03.)

Plaintiff's application for disability benefits indicated that she stopped working on January 23, 2007. (Tr. 101.) At the start of the hearing, however, plaintiff's counsel informed the ALJ that, as of June 2008, plaintiff had been working, without pay, for 21 hours per week at a Salvation Army store in order to maintain her public assistance. (Tr. 12, 14.) Plaintiff testified that her job duties include hanging up clothes, taking them off the racks, sorting through donations, and tagging items. (Tr. 14-15.) Plaintiff further testified that she performed these duties while standing and that she lifts objects that weigh between twenty and thirty pounds. (Tr. 15-16.) Plaintiff indicated that sometimes a co-worker will help her move heavy objects, but on other occasions she manages to move heavy items herself, although she is in pain afterwards. (Tr. 30.) According to plaintiff, her supervisor allows her to take breaks, but she has difficulty completing her work. (Tr. 27.)

During the hearing, plaintiff asserted that she could not work for forty hours per week because of spurs on her feet and a bad knee, back, and shoulder. (Tr. 20.) Plaintiff testified that she could not sit, stand, or walk for extended periods, and that she had a difficult time bending to lift things up. (Tr. 20.) Specifically, plaintiff testified that she could only sit for between five and fifteen minutes, and stand for between ten and fifteen minutes. (Tr. 20.) Plaintiff further testified that she could walk between fifty and one hundred feet with mild to extreme pain. (Tr.

21.)  Finally, plaintiff stated that she could lift no more than fifteen pounds.  (Tr. 21.)

Plaintiff testified that she does not cook and does very little cleaning.  (Tr. 25-26.)  She testified that she does not drive, but that she takes the public bus to get to and from work.  (Tr. 26.)  The bus that plaintiff rides is equipped with a handicap-accessible lift, but she has trouble getting on and off the bus.  (Tr. 28.)  Plaintiff testified that, in terms of recreation, she watches television, reads, knits, or crochets.  (Tr. 26.)

Plaintiff testified that her pain intensifies when she sits for long periods of time.  (Tr. 29.)  She stated that if she stands for a few moments and then sits back down, "sometimes [the pain] will shift, other times it like leaves."  (Tr. 29.)  Plaintiff further testified that her knee swells up, locks, cracks, and sometimes "go[es] out from underneath" her.  (Tr. 29.)  Plaintiff indicated that she walks with a limp and sometimes has to lean on things to walk.  (Tr. 30.)  With respect to her shoulder pain, plaintiff testified that she has never been treated or hospitalized for that pain.  (Tr. 22.)  Plaintiff stated that he sees an orthopedist, Dr. Feldman, for her heel spurs and knee problems.  Seven years prior to the hearing, plaintiff underwent an operation to remove spurs from the tops of her feet.  (Tr. 23.)  Plaintiff testified that Dr. Feldman has recommended that she have another such operation, but she has not scheduled it for fear that she will lose her job and, by extension, her public benefits.  (Tr. 23-24, 28.)

### 2.   Function Report

On July 12, 2007, plaintiff completed a Function Report for submission to the New York State Office of Temporary and Disability Assistance, Division of Disability Determination.  (Tr. 113.)  In the Function Report, plaintiff stated that she lived in a homeless shelter with her husband and other married couples.  (Tr. 113.)  Plaintiff described her daily activities as

4

including reading, writing, listening to music, watching television, and performing limited washing and chores. (Tr. 113.) Plaintiff stated that she takes care of her husband by cooking, giving him medication, and checking on his health daily. (Tr. 114.) She indicated that she could not do household chores, exercise, work at a job, or bend, lift, push, pull, or climb stairs. (Tr. 114.) Plaintiff also stated that the pain in her feet and knees interrupted her sleep. (Tr. 114.) Plaintiff indicated that she did not have problems with personal care, although she did require help to put on or take off clothing due to her knee and foot pain. (Tr. 114-15.) Plaintiff stated that her husband usually cooked, although she often made her own breakfast and lunch by preparing microwave or fast food. (Tr. 115.)

      **B.**    *Medical Evidence*

          **1.**    <u>**Dr. Matthew Illikal – Orthopedist**</u>

The Division of Disability Determination referred plaintiff to Dr. Illikal for an orthopedic examination, which was conducted on July 19, 2007. (Tr. 143.) Plaintiff complained of left knee and shoulder pain as well as a calcaneal spur on her right foot. (Tr. 143.) Plaintiff recounted that in 1998 her left knee had been crushed between the bumpers of two cars, and she was taken to Huntington Hospital. (Tr. 143.) X-rays revealed a hairline fracture on the patella, and her left knee was immobilized in a brace for four weeks. (Tr. 143.) During the examination, plaintiff complained of intermittent aching pain in the left knee, extending to her left thigh. (Tr. 143.) She reported that she could sit and lie down in bed without discomfort, and could stand for more than thirty minutes and walk for longer than 3/4 of a mile. (Tr. 143.) Plaintiff stated that she could not bend her knee to pick up anything from the floor, or lift more than ten pounds. (Tr. 143.)

Plaintiff also complained of pain in her left shoulder, but could not recall any inciting event except for a motor vehicle accident around 1987.  (Tr. 143.)  She described the pain as intermittent, and stated that she had never received any medical evaluation or treatment for it.  (Tr. 143.)  Plaintiff claimed that she had limited range of motion in her left arm.  (Tr. 143.)  Plaintiff also complained of right heel pain that had become severe in 2007, for which she had received no medical consultation or treatment.  (Tr. 143.)  She stated that it was painful for her to walk.  (Tr. 143.)  Plaintiff stated that she cooked five times a week, with the help of her husband.  (Tr. 144.)  She further reported that she showered and dressed daily, watched television, listened to the radio, and read.  (Tr. 144.)

On examination, Dr. Illikal observed that Plaintiff was in no acute distress.  (Tr. 144.)  She walked with a mild limp and was unable to walk on her heels due to the right foot spur.  (Tr. 144.)  Plaintiff's squatting was half the normal range, her station was normal, and she used no assistive device.  (Tr. 144.)  Plaintiff did not require assistance to change for the exam or get on and off the exam table.  (Tr. 144-45.)  The examination of the cervical, thoracic, and lumbar spines was normal.  (Tr. 145.)  The forward flexion of her shoulders was 150 degrees on the right and 135 degrees on the left.  (Tr. 145.)  The range of motion of plaintiff's left shoulder was limited due to her complaints of pain, and the internal and external rotation were reduced.  (Tr. 145.)

Dr. Illikal diagnosed arthralgia of plaintiff's left knee and moderate osteoarthritis, as well as a calcaneal spur on plaintiff's right heel, and arthralgia of her left shoulder.  (Tr. 146.)  The doctor opined that plaintiff had a mild limitation in standing and walking, bending her left knee, picking up objects off the floor, flexion and abduction of the left shoulder, and lifting

6

and carrying with her left hand.  (Tr. 146.)

X-rays performed on July 19, 2007 revealed moderate osteoarthritic changes around the knee, no evidence of a current fracture or evidence of any healing change from the previous fracture, and no step-off at the tibial plateau.  (Tr. 147.)  The x-rays of Plaintiff's right foot and toes were unremarkable except for a plantar calcaneal spur.  (Tr. 147.)

### 2.   Dr. William Bollhofer, D.O.

Plaintiff was examined by Dr. Bollhofer, of the Queens Long Island Medical Group ("QLI Medical") on November 23, 2007.[2]  (Tr. 208.)  Plaintiff presented with multiple complaints, including left arm and left knee pain, spurs on her left foot, a lump in the middle of her chest, a double ear infection, hot flashes, and a rash in her groin area.  (Tr. 208.)  A musculoskeletal examination revealed pain in plaintiff's left shoulder when it was actively or passively moved.  (Tr. 209.)  Dr. Bollhofer observed that plaintiff's shoulder did not suddenly "lock up" or catch during movement, and the shoulder joint did not feel unstable or "out of place."  (Tr. 209.)  Dr. Bollhofer also noted that plaintiff experienced pain when her left knee was actively or passively moved, and that such pain got worse with "weightbearing."  (Tr. 209.)  Although Dr. Bollhofer did not observe any swelling, redness, or warmth of plaintiff's knee, he did take note of a clicking or grating sensation in her left knee.  (Tr. 209.)

Dr. Bollhofer diagnosed plaintiff with flushing, tinea cruris of the groin, acute arthropathy of the shoulder region, arthropathy of the left knee, patella, tibia, and fibula, as well as a calcancal spur, nicotine dependence, and lipoma of the fatty tissue.  (Tr. 209.)  Dr. Bollhofer

---

[2]     The record does not indicate whether plaintiff was referred to Dr. Bollhofer or whether she saw him on her own initiative.

noted that plaintiff's calcaneal spurs were asymptomatic, and he instructed plaintiff to consult a podiatrist if the symptoms returned.  (Tr. 209.)  For plaintiff's shoulder and knee pain, Dr. Bollhofer prescribed a Medrol dose pack, warm compresses, and certain range of motion exercises.  (Tr. 212.)

### 3.   Dr. Shankar Iyer – Surgeon

On January 7, 2008, Dr. Shankar Iyer, also of QLI Medical, examined the soft tissue mass on plaintiff's chest, which was first observed during her November 23, 2007 visit with Dr. Bollhofer.  (Tr. 192.)  Dr. Iyer determined the mass to be a lipoma[3] and recommended that it be reevaluated in six months or if it increased in size.  (Tr. 193.)

### 4.   Dr. Neil Ferrara – Gastroenterologist

On February 25, 2008, Dr. Neil Ferrara, also of QLI Medical, examined plaintiff in connection with "rare" blood in her rectum.  (Tr. 187.)  Plaintiff reported that she did not feel "tired or poorly."  (Tr. 187.)  A review of plaintiff's gastrointestinal symptoms revealed no dysphagia, pain on swallowing, heartburn, or abdominal pain.  (Tr. 187.)  Dr. Ferrara ordered blood work and a colonoscopy.  (Tr. 188.)

### 5.   Plaintiff's Request for Documentation

On March 13, 2008, plaintiff requested that QLI Medical provide her with a letter stating that she cannot work because she has a bad knee, back, arthritic feet, and is limited in her ability to sit and stand.  (Tr. 169.)  A notation on plaintiff's request form indicates that an employee of QLI Medical informed plaintiff that Dr. Bollhofer would not write such a letter because plaintiff

---

[3]      According to the Commissioner, a lipoma is "a benign tumor composed of adipose tissue."  (Def.'s Mem. at 6 n.3 (citing Dorland's Illustrated Med. Dictionary 1016 (30th ed. 2003)).)

had only seen him once.  (Tr. 169.)  Plaintiff was told that she would need to see an orthopedist.  (Tr. 169.)

### 6.    Dr. Harold Grafstein – Gynecologist

On February 7, 2008, plaintiff saw Dr. Harold Grafstein, also of QLI Medical, for a pelvic examination.  (Tr. 190-91.)  Dr. Grafstein conducted follow up examinations of plaintiff in March and May 2008, after testing revealed an abnormal Pap smear and mild dysplasia of the cervix.  (Tr. 159-66, 170-71.)  On May 1, 2008, plaintiff underwent a colposcopy/loop electrosurgical excision procedure (LEEP) to remove abnormal cervical cells.  (Tr. 174, 177, 179.)  On May 2, 2008, Dr. Grafstein wrote a letter indicating that plaintiff needed to be on light duty for six days – between May 2 and May 7, 2008 – following the procedure.  (Tr. 175.)

### 7.    Dr. Feldman

On June 11, 2008, plaintiff was examined by Dr. Feldman, also of QLI Medical, based on her complaints of left knee pain and bilateral heel pain.  (Tr. 153.)  Dr. Feldman's physical examination revealed no effusion in the left knee and a full range of motion.  (Tr. 153.)  Dr. Feldman did not observe any varus/valgus or anterior/posterior instability with localized tenderness over the medial and posterior medial joint line.  (Tr. 153.)  Dr. Feldman's examination of plaintiff's feet revealed normal skin color and turgor with localizing tenderness over the medial calcaneal tuberosities.  (Tr. 153.)

X-rays of the left knee revealed evidence of medial joint space narrowing.  (Tr. 153.)  Dr. Feldman did not observe any evidence of an acute fracture, dislocation, or interosseous pathology.  (Tr. 153.)  X-rays of plaintiff's feet revealed evidence of calcaneal spurs, greater on the right than the left, with underlying plantar fasciitis.  (Tr. 153.)

9

Dr. Feldman diagnosed early degenerative changes in plaintiff's left knee, although he could not exclude underlying meniscal pathology. (Tr. 153.) The doctor recommended a magnetic resonance imaging (MRI) study for further evaluation and prescribed an anti-inflammatory medication. (Tr. 153.) Dr. Feldman also diagnosed bilateral plantar fasciitis, and recommended a stretching program and physical therapy. (Tr. 154.)

### C.   Vocational Expert's Testimony

Edna Clark took the stand during the November 2008 hearing as an expert vocational witness. (Tr. 31.) Clark testified that plaintiff's prior position as an electronics inspector was light and semi-skilled with an SVP of three, under the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") Code 726.684-022, although Clark was of the opinion that, based on plaintiff's testimony at the hearing, plaintiff actually performed that work at the sedentary level. (Tr. 32.) Plaintiff's work for the same employer as an electronics assembler was light and semi-skilled with an SVP of four, under DOT Code 726.684-018, although plaintiff's testimony led Clark to conclude that plaintiff also performed that work at the sedentary level. (Tr. 32.) Clark testified that plaintiff had only job-specific, non-transferrable skills. (Tr. 33.)

The ALJ asked Clark to assume a hypothetical individual of the same age, education, and work history as plaintiff who was limited to the performance of light work and who had occasional postural limitations (i.e., climbing and balancing). (Tr. 33.) Clark testified that this hypothetical individual could perform plaintiff's past jobs as an electronic inspector and assembler as those positions were generally performed in the national economy. (Tr. 33.)

The ALJ then asked Clark to consider an individual with the same vocational profile as in the first hypothetical, but who was also limited in picking up objects from the floor, and in

10

reaching and handling with the left upper extremity (the dominant hand).  (Tr. 33-34.)  Clark testified that such a hypothetical individual could not perform plaintiff's past work as an electronics inspector or assembler.  (Tr. 34.)  Clark further testified, however, such a hypothetical individual could perform other work in the national or regional economy as, for example, a final assembler (DOT Code 789.687-046, which involves light duty work with an SVP of two, and with 3,000 jobs in the local economy and 15,000 jobs in the national economy), hand trimmer (DOT Code 781.687-070, which involves light duty work with an SVP of two and 2,000 jobs locally, and 14,000 nationally), and as a messenger (DOT Code 230.663-010, which involves light duty work with an SVP of two, and with 14,000 positions locally, and 40,000 nationally). (Tr. 34.)

The ALJ then posed a third hypothetical involving an individual of the same vocational profile as plaintiff, who was limited to sedentary work, and who was limited in the ability to pick up objects from the floor.  (Tr. 35.)  Clark testified that such a hypothetical individual could perform plaintiff's past work as an electronics inspector and assembler.  (Tr. 35.)  Finally, the ALJ instructed Clark to assume that all of plaintiff's testimony regarding her limitations was credible, and asked Clark whether a hypothetical individual with all such limitations could perform plaintiff's past work.  (Tr. 35.)  Clark answered that since plaintiff performed her past work with a sit/stand option and lifted less than one pound, a hypothetical individual with plaintiff's alleged limitations could perform plaintiff's past work.  (Tr. 35.)

Next, plaintiff's attorney asked Clark several questions.  Plaintiff's counsel stated  that plaintiff had testified that she suffered from "extreme pain" in her back, knee, foot and shoulder, and that she could sit for only limited periods of time due to this pain.  (Tr. 35-36.)  Plaintiff's

attorney asked whether such pain would limit plaintiff's ability to perform sedentary work.  (Tr. 36.)  Clark responded that the accommodations that plaintiff received in her prior jobs permitted her to perform sedentary work; plaintiff had the option to stand if her back hurt and then sit back down if her knee hurt.  (Tr. 36.)  Plaintiff's counsel then described a hypothetical individual who experienced pain that limited her ability to sit to periods of only ten to fifteen minutes, who then had to stand up to alleviate the pain, and who experienced worse pain when she sat back down. (Tr. 38.)  Clark testified that such a hypothetical individual could not perform sedentary work. (Tr. 38.)

> **D.   *Medical Evidence Submitted to the AC After the Hearing and ALJ's Decision***
>
> **1.   Catherine Geoghan, LMSW**

On March 16, 2009, approximately five months after the ALJ rendered his decision on plaintiff's claim, Catherine Geoghan, LMSW, wrote a letter addressed "To Whom it May Concern," indicating that plaintiff was participating in counseling offered at her residential program.  (Tr. 76.)  As of that date, plaintiff had attended three counseling sessions.  (Tr. 76.)

> **2.   Warren R. Levine, RCSW, LCSW, Behavior Therapist**

On April 16, 2009, Warren Levine, RCSW, LCSW, completed a Suffolk County Department of Social Services Psychiatric Assessment for Determination of Employability form. (Tr. 73-74.)  Levine indicated that he had provided individual psychotherapy sessions to plaintiff twice per week beginning on March 3, 2009.  (Tr. 73.)   Levine diagnosed plaintiff as having an intermittent explosive disorder and a personality disorder.  (Tr. 73.)  He reported that plaintiff had taken repetitive violent actions towards herself or others on occasion, and had lost a job or failed to complete an education program due to her psychiatric conditions.  (Tr. 74.)  Levine

12

noted that plaintiff's behavior frequently interfered with her activities of daily living.  (Tr. 74.)

Plaintiff did not exhibit any evidence of a limitation on her ability to understand and remember

simple instructions, to maintain basic standards of personal hygiene and grooming, or to use

public transportation.  (Tr. 74.)  Levine found plaintiff moderately limited in her ability to

understand and remember complex instructions, to maintain attention and concentration, to

interact appropriately with others, to maintain socially appropriate behavior, and to complete low

stress, simple tasks.  (Tr. 74.)  Levine assigned plaintiff a Global Assessment of Functioning

("GAF") score of 56.  (Tr. 73.)  A note from Levine, dated April 21, 2009 confirmed plaintiff's

attendance at an intake evaluation on March 17, 2009, and twice weekly therapy sessions since

that date.  (Tr. 75.)

### 2.    Mark Gresser, DPM

On May 4, 2009, Mark Gresser, DPM, completed a Physical Assessment form for the

Suffolk County Department of Social Services.  (Tr. 77-78.)  Dr. Gresser indicated that he had

treated plaintiff's heel spur by administering steroid injections on a weekly basis between April

20, 2009 and the date he completed the form.  (Tr. 77.)  Dr. Gresser noted that plaintiff could

stand or walk for one to two hours a day, and could sit for more than four hours.  (Tr. 78.)  He

also stated that plaintiff could lift ten pounds occasionally, but that she was moderately limited in

her ability to use public transportation.  (Tr. 78.)  Dr. Gresser opined that plaintiff was capable of

full time employment, education, or training, so long as it entailed "seated work."  (Tr. 78.)

### 3.    S. Chandra Shekher, M.D.

Dr. S. Chandra Shekher began providing individual psychotherapy sessions to plaintiff on

May 14, 2009.  (Tr. 71.)  On May 21, 2009, Dr. Shekher completed a Psychiatric Assessment for

Determination of Employability for the Suffolk County Department of Social Services.  (Tr. 71-72.)  Dr. Shekher diagnosed plaintiff as suffering from bipolar and other personality disorder.  (Tr. 71.)  She indicated that plaintiff had no history of past treatment, acute psychiatric hospitalizations, or suicide attempts.  (Tr. 72.)  Dr. Shekher wrote that, on occasion, plaintiff engaged in behavior that interfered with her activities of daily living, and had lost a job or failed to complete an education or training program because of her psychiatric conditions.  (Tr. 72.)  Dr. Shekher opined that plaintiff was able to understand and remember simple and complex instructions, to maintain attention and concentration, and to use public transportation.  (Tr. 72.)  She stated that plaintiff was only moderately limited in her ability to interact appropriately with others, maintain socially appropriate behavior, and maintain basic standards of personal hygiene and grooming.  (Tr. 72.)  Dr. Shekher indicated, however, that plaintiff was very limited in her ability to perform low stress, simple tasks.  (Tr. 72.)  Dr. Shekher assigned plaintiff a GAF score of 41.  (Tr. 71.)

## DISCUSSION

### I.      Legal Standards

#### A.      Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a

14

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). Thus, the only issue before the Court is whether the ALJ's finding that plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

**B.    *Eligibility for Disability Benefits***

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe

15

> impairment" which significantly limits his physical or mental
> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and
> work experience . . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (alterations in the original) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467

(2d Cir. 1982) (per curium)).  The claimant bears the burden of proof at steps one through four,

while the burden shifts to the Commissioner at step five to show that the claimant is capable of

working.  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

## II.     *The ALJ's Decision*

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that

plaintiff satisfied the first two steps, to wit: (1) plaintiff had not engaged in substantial gainful

activity since January 23, 2007; and (2) plaintiff's left knee and shoulder impairments with

associated pain, as well as her back pain and right heel bone spur all constituted severe

impairments.  (Tr. 45.)  The ALJ concluded that plaintiff did not meet the third step, however,

because her impairments did not meet or equal in severity any impairment in the Listing of

Impairments, Appendix 1, Subpart P, Part 404 of the Regulations.  (Tr. 45.)

The ALJ next found under the fourth factor that plaintiff had the residual functional

capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) "but

for a limited ability to pick up objects from the floor."  (Tr. 45.)  The ALJ further found that

plaintiff was capable of performing her past relevant work as an electronics inspector and electronics assembler.  (Tr. 47.)  The ALJ found that this work did not require the performance of activities precluded by plaintiff's residual functional capacity.  (Tr. 47.)  In this regard, the ALJ relied on Clark's testimony that although the positions of electronics inspector and electronics assembler are classified as light in the DOT, because plaintiff performed that work with a sit/stand option and lifted less than one pound (i.e., in a manner that was less strenuous than what would normally be considered light duty), that work could be classified as sedentary.  (Tr. 47.)

Accordingly, the ALJ determined that plaintiff was not disabled under the SSA from January 23, 2007 through the date of the decision.  (Tr. 47).

III.    *The Parties' Arguments*

Plaintiff asserts two main objections to the ALJ's decision.  First, she contests the ALJ's finding that her subjective testimony regarding the intensity, persistence, and limiting effects of her symptoms was not credible.  (*See* Pl.'s Opp'n at 11; Tr. 46.)  Plaintiff asserts that if the ALJ had fully credited her testimony about the intensity and effects of her symptoms, and considered her testimony in conjunction with Clark's testimony, the ALJ would have found plaintiff unable "to perform any work, sedentary or otherwise."  (Pl.'s Opp'n at 11, 16.)  Plaintiff further argues that even if the ALJ was not "persuaded by plaintiff's testimony," the "medical evidence unequivocally proves that [she] is suffering [from] severe mental and physical disabilities."  (*Id.* at 18.)

Second, plaintiff argues that the AC erred in refusing to consider the medical evidence of plaintiff's mental impairments, which was submitted after the ALJ rendered the November 2008 decision.  (*See id.* at 12.)

17

IV.     *Application of the Governing Law to the Present Facts*

    A.     *Assessment of Credibility*

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding her symptoms when analyzing whether she is disabled.  *See* 20 C.F.R. § 404.1529(a). The regulations contemplate a two-step process to evaluate a claimant's subjective testimony regarding her symptoms.  First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the claimed symptoms.  *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  Here, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Tr. 46.)

Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186 at *2.   If a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight."  *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted).  If, however, a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, additional factors must be considered.  *See* 20 C.F.R. § 404.1529(c)(3).  These include daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms.  *Id.*

In the present case, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they

are inconsistent with the above residual functional capacity assessment." (Tr. 46.)  In particular, the ALJ noted that although plaintiff testified as to the physical limitations caused by her pain (i.e., sitting for no longer than five to fifteen minutes, standing for no longer than ten to fifteen minutes, no lifting more than fifteen pounds, and walking only 50-100 feet with mild to extreme pain), none of the records from the QLI Medical doctors contained any "restrictions preclusive of lighter forms of employment . . . nor can any reasonably be discerned." (Tr. 47.)  Moreover, the ALJ found that Dr. Illikal, the only doctor who addressed plaintiff's limitations in the areas of standing, walking, and lifting, "furnished a profile essentially consistent with sedentary work as he noted mild limitations regarding standing/walking; bending of the left knee; flexing of the left shoulder; and lifting/carrying weight with the left hand." (Tr. 47.)

The Court agrees with the ALJ's conclusion that plaintiff's testimony regarding the limiting effects of her medical impairment was not substantiated by objective medical evidence. The ALJ's task, then, was to "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2; *Vargas v. Astrue*, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011) (stating that if an ALJ's credibility determination is supported by substantial evidence, it must be upheld) (citing *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 558, 591 (2d Cir. 1984)).  Here, the ALJ found that "the claimant's statements regarding her activities of daily living are inconsistent with the work performed in repayment of her grant." (Tr. 46.)  In particular, plaintiff testified that during her 21 hours per week working at the Salvation Army, she performs her job duties while standing.  (*See* Tr. 46.)  Plaintiff also testified that she was able to perform her past job duties as electronics inspector and electronics assembler in either a sitting or standing position.  (Tr. 46.)

19

In addition, the record demonstrates the existence of certain discrepancies with respect to plaintiff's statements about her abilities.  For example, although the record contains evidence of statements by plaintiff recounting a limited ability to dress herself without help (Tr. 114-15), other record evidence demonstrates that plaintiff showered and dressed daily (Tr. 144) and did not require assistance changing before medical examinations (Tr. 144-45). Moreover, the ALJ noted that Suffolk County Social Services did not grant plaintiff a medical waiver regarding the repayment of her grant, and the ALJ inferred that "Suffolk County has found the claimant medically fit for work." (Tr. 46.)  Finally, the Court notes that the ALJ did account for plaintiff's testimony regarding her limited ability to lift objects off the ground; his ultimate conclusion was that plaintiff was able to perform sedentary work "but for a limited ability to pick up objects from the floor." (Tr. 45.)

Therefore, the Court finds that the ALJ's findings as to plaintiff's credibility are supported by substantial evidence and are, therefore, upheld.

### B.    *Consideration of Evidence Post-Dating the Hearing*

Plaintiff also contends that the AC erred when it did not provide "proper consideration" to her psychiatric and psychological impairments, which are documented in the medical records submitted to the AC after it issued the June 2, 2009 notice.  Plaintiff argues that this information "supports a remand for a new Administrative Hearing to determine whether plaintiff's psychiatric and psychological impairments are disabling." (Pl.'s Opp'n at 13.)

In connection with its review of an ALJ's decision on an application for benefits, the AC is required to consider "new and material evidence . . . only where it relates to the period on or before the date of the administrative law judge['s] [ ] decision." 20 C.F.R. § 416.1470(b).  Here,

as defendant correctly points out, "all of the evidence submitted to the [AC] postdated the [ ] ALJ's [November 17, 2008] decision by five to six months." (*See* Def.'s Mem. at 20.)  The Court notes that Dr. Gresser's records relate to his treatment of plaintiff's heel spur, a condition that plaintiff had at the time the ALJ considered her application.  However, because Dr. Gresser's records reflect treatment for the period between April 20, 2009 and May 4, 2009 (Tr. 77-78) – which was not the time period at issue before the ALJ – the AC was not required to consider them.  *See Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D.Conn. 2009) ("Evidence is material in this context if it is relevant to the plaintiff's condition during the time period at issue and it is probative.  The SSA thus need not consider evidence related to plaintiff's condition after the ALJ's decision . . . .") (internal citation omitted).

Moreover, there is no indication that any of plaintiff's documented psychological impairments existed prior to March 2009.  Plaintiff's proper remedy in connection with any psychological conditions that developed after the relevant period would be to submit a new application for benefits.  *See Quinlivan v. Comm'r of Soc. Sec.*, 2011 WL 2413491, at *8 (N.D.N.Y. May 23, 2011).

*CONCLUSION*

For the reasons set forth above, defendant's motion is granted and the decision of the

Commissioner is affirmed.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated:   Central Islip, New York
             September 28, 2011

                                                        ___/s/_____
                                                        Denis R. Hurley
                                                        United States District Judge

22